UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:21-cv-156-MOC-WCM

| KRISTINA RENE FROST and | ) | |
|---|---|---|
| GARY ALLEN MAYS, | ) | |
| *Individually and as Personal* | ) | |
| *Representatives of the Estates of* | ) | |
| Shawna Rene Mays and | ) | |
| Tristan Allen Mays, | ) | |
| | ) | **ORDER** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMSAFE COMMERCIAL | ) | |
| PRODUCTS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** comes before the Court on a motion to dismiss, filed by Defendants AmSafe Commercial Products, Inc., AmSafe Inc., Transdigm Group, Inc., and Shield Restraint Systems, Inc., pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. (Doc. No. 10). This Court held a hearing on the motion on February 11, 2022.

### I. FACTUAL BACKGROUND

Plaintiffs Kristina Rene Frost ("Frost") and Gary Allen Mays ("Mays"), Individually and as Co-Personal Representatives of the Estates of Shawna Rene Mays and Tristan Allen Mays (collectively "Plaintiffs") filed claims against AmSafe Commercial Products, Inc. ("ACP"), AmSafe Inc. ("AmSafe"), TransDigm Group Inc. ("TransDigm") and Shield Restraint Systems, Inc. ("Shield") (collectively, "Defendants") for an allegedly defective buckle in Frost's sister's Evenflo car seat. Plaintiffs contend they discovered the unspecified defect with the buckle when Frost was unable to quickly unlatch the car seat buckle and remove her son from

1

her 2004 Buick Rendezvous when it caught fire on July 3, 2018. Plaintiffs' two young children died in the fire.

### A. The July 3, 2018 Car Fire

On July 3, 2018, Kristina Frost was driving her 2004 Buick Rendezvous through Jackson County, North Carolina. (Compl. ¶ 2). She was traveling to Western Carolina University to celebrate the Fourth of July with family and friends. (Id.). She was traveling with her five-year-old daughter, Shawna, and her two-year-old son, Tristan, in the backseat. (Id. Frost and her children were all residents and citizens of North Carolina. (Id. ¶ 8).

While she was driving, a passing driver gestured for Frost to pull over. (Id. ¶ 2). When Frost pulled over, she noticed smoke coming out from under the hood. (Id. ¶ 3). When she opened her driver's side door, the flames were already taller than her. (Id.). Frost opened the back door and tried to unbuckle her daughter from her seatbelt, but Frost caught fire and rolled herself on the grass to extinguish the flames. (Id.). Frost then ran to her son's side and attempted to unbuckle his car seat's seatbelt. (Id.). The buckle stuck and would not release. (Id.). Frost caught fire again, as flames from underneath the car caught her arms and legs on fire. (Id.).

Because Frost could not release the car seat buckle, Tristan died. And, after rolling herself on the grass a second time, Frost rose to see her daughter Shawna all black with no skin and no hair. (Id.). Shawna, died the following day. (Id. ¶ 4). Frost suffered significant physical disfigurement and is the sole survivor of the accident. (Id.). Frost's attempts to free Tristan from the buckle cost valuable time that could have been used to free both children and move them to safety, away from the flames. (Id. ¶ 23).

### B. The Allegedly Defective Buckle

2

Plaintiffs allege that at the time of the fire, Tristan was fastened in a SureRide/Evenflo Titan 65 car seat equipped with a defective buckle jointly manufactured, designed, distributed, supplied, marketed, and sold by Defendants to Evenflo for use in car seats, just like the one Tristan was riding in. (Id. ¶ 5). The car seat belonged to Frost's sister, who received it as a gift at a baby shower around August 2012. (Id. ¶ 22). Frost's sister received the car seat in North Carolina, where she also lived. (Declaration of Kristina Rene Frost (hereinafter "K. Frost Decl.") ¶ 5). The car seat was purchased in North Carolina by another North Carolina resident. (Id.). Frost was borrowing the seat temporarily because her son's regular car seat was being cleaned. (Declaration of Tammy Pauline Frost (hereinafter "T. Frost Decl.") ¶ 4).

By early 2014, the Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration ("NHTSA") had already received 18 reports from consumers alleging unlatching difficulty (and nine consumers reporting that they could not unlatch the buckle at all). (Compl. ¶ 34). Since then, there have been hundreds more unbuckling issues reported. (Id. ¶ 35).

Evenflo eventually recalled all SureRide and Titan 65 models manufactured between June 20, 2012 and October 17, 2013.[1] Evenflo's recall website explains, "[t]hese select models use a harness crotch buckle which may become resistant to unlatching over time, due to exposure to various contaminants (like food and drinks) that are present in everyday use of the convertible car seat or harnessed booster by toddlers. This condition may make it difficult to remove a child

---

[1] Evenflo, Convertible Car Seat Harness Buckle Recall, http://safety.evenflo.com/cs/sc/cssc99_RD.phtml?rid=EFR36&src=WEB (last visited 1/11/2022).

from the vehicle."[2] Kristina and her sister were not told of the recall and did not know of the buckle issues until the car fire. (T. Frost Decl. ¶ 7; K. Frost Decl. ¶ 6).

## II. BACKGROUND

### A. Procedural Background

Plaintiffs filed this lawsuit in North Carolina in June 2021, asserting claims against Defendants for: negligence, gross negligence, and recklessness (Count 1); products liability: Improper Design N.C. GEN. STAT. § 99B-6 (Count 2); fraud by non-disclosure (Count 3); fraud by misrepresentation (Count 4); wrongful death (Count 5); survival claims (Count 6); bystander claims (Count 7); and Products Liability: Failure to Warn, N.C. GEN. STAT. § 99B-5 (Count 8).

On July 16, 2021, Defendants moved to dismiss, asserting lack of personal jurisdiction. Plaintiffs requested jurisdictional discovery as well as an extension of time to respond to Defendants' motion to dismiss. The Court granted the motion on October 8, 2021. (Doc. No. 30). Plaintiffs filed a response to the motion to dismiss on January 13, 2022, and Defendants filed a Reply on January 21, 2022. (Doc. Nos. 40, 44). The Court held a hearing on the motion to dismiss on February 11, 2022.

### B. The Relationships among Defendants and Undisputed Facts Developed in Jurisdictional Discovery

Here, the named Defendants are AmSafe Commercial Products, Inc. ("AmSafe Commercial"), AmSafe, Inc. ("AmSafe Inc."), TransDigm Group, Inc. ("TransDigm"), and Shield Restraint Systems, Inc. ("Shield").[3] AmSafe Commercial made the QT and QT3 harness

---

[2] Id.
[3] Plaintiffs have alleged an alter ego theory as to Defendants. In evaluating personal jurisdiction, courts will apply and assume to be true an "alter ego" theory of jurisdiction to parent entities. See, e.g., Bundy v. CitySwitch II, No. 3:20cv618, 2021 WL 4142677, at *6 (W.D.N.C. Sept. 10, 2021) ("Based on the allegations and record here, the Court will—for purposes of evaluating

4

crotch buckle on Tristan's car seat. (Zabalgoitia Decl. Ex. A (Shield 30(b)(6) Dep. 17:13–17)). In 2014, AmSafe Commercial rebranded into Shield Restraints Systems, Incorporated ("Shield"). (Id. (Shield 30(b)(6) Dep. 18:4–18)). This was not a legal change to AmSafe Commercial's structure; it was simply a rebranding. (Id. (Shield 30(b)(6) Dep. 18:13–19)). For this reason, the "people who were running the business as AmSafe Commercial Products ultimately were the same people running the business as Shield." (Id. (Shield 30(b)(6) Dep. 19:4–6)).

AmSafe Commercial announced this rebranding in a press release explaining, "[o]n September 1, 2014, AmSafe Commercial Products Inc. becomes SHIELD Restraint Systems Inc. – rebranding the company with a fresh new look from top to bottom that better represents their focus on providing customers worldwide with affordable safety innovations in the child and specialty vehicle restraints industries."

Before the 2014 rebranding, AmSafe Inc. had three separate companies: AmSafe Commercial, AmSafe Aviation, and AmSafe Bridport. (Zabalgoitia Decl. Ex. A (Shield 30(b)(6) Dep. 17:22-18:2)). But in February 2012, "TransDigm Group completed the purchase of AmSafe Global Holdings." (Id. (Shield 30(b)(6) Dep. 47:4–8)). As a result, TransDigm owns Shield today. (See, e.g., Zabalgoitia Decl. Ex. C (TransDigm 30(b)(6) Dep. 15:1–4 (confirming that Shield is a subsidiary of TransDigm))).

Each Defendant has a different principal place of business. AmSafe Commercial and AmSafe Inc. have their principal place of business in Arizona (Compl. ¶ 10); TransDigm has its principal place of business in Ohio (Compl. ¶ 13); and Shield has its principal place of business in Indiana (Compl. ¶ 14).

---

personal jurisdiction only—apply an 'alter ego' theory of jurisdiction for both CitySwitch entities.").

In support of their argument that this Court may exercise specific jurisdiction over Defendants, Plaintiffs argue that Defendants have contacts with North Carolina both through the specific buckle at issue in this lawsuit and through their sale of other seat buckles and products into North Carolina. Defendants have customers, sales, and operate multiple businesses in North Carolina. With respect to the buckle at issue in this lawsuit, Defendants admitted that they "knew and understood that by putting the QT/QT3 buckle into the stream of commerce through Evenflo that if there was a problem with the buckle related to safety, that could cause injuries to consumers in North Carolina[.]" (Zabalgoitia Decl. Ex. A (Shield 30(b)(6) Dep. 44:17-45:1)). Moreover, "the parts are certified to North American requirements, so distribution in the United States is–is reasonably expected." (Id. (Shield 30(b)(6) Dep. 12:19–21)). To this end, TransDigm's website advertises that "[a]round the world, leading vehicle manufacturers, seating providers, aftermarket distributors and child safety seat manufacturers trust SHIELD for quality occupant safety systems and restraints." While Shield's website is currently disabled, internet archives show that Shield has touted itself as one of the "world's top manufacturers." Shield "produce[s] more than 15 million seatbelts a year, all rigorously engineered, tested and delivered on time at fair prices with great customer service." Shield's LinkedIn page advertises that it is "Trusted. Everywhere."

Defendant AmSafe Commercial (now Shield) sells three-point seat belts as well "fire equipment apparatus makers" to customers in North Carolina. (Zabalgoitia Decl. Ex. A (Shield 30(b)(6) Dep. 67:1–25) ("We provided seat belts to customers, commercial entities, within North Carolina for standard seat belts, non-juvenile products.")). This business has continued from at least 2012 through the present. (Id. (Shield 30(b)(6) Dep. 70:12–15) (admitting AmSafe did business in North Carolina in 2011-2012 as well as currently)). AmSafe Commercial's (now

6

Shield's) customers include American LaFrance, who purchases seat belts for fire trucks in North Carolina. (Id. (Shield 30(b)(6) Dep. 71:10–25).) For these customers, AmSafe Commercial (now Shield) ships directly from Indiana to North Carolina. (Id. (Shield 30(b)(6) Dep. 70:21–25)).

The TransDigm corporate witness testified that, because TransDigm is a holding company, it does not sell any products itself or have any employees. (Zabalgoitia Decl. Ex. C (TransDigm 30(b)(6) Dep. 9:11; 11:2–3)). For this reason, all of its work is done through its subsidiaries. Transdigm has two subsidiaries in North Carolina, one in Goldsboro and Lillington. (Id. (TransDigm 30(b)(6) Dep. 25:19–21)). These locations are displayed on TransDigm's website where it maps its "global locations" on its website.

Defendant AmSafe Inc. also tells North Carolina customers that they should only use "AmSafe and AmSafe approved repair stations." The AmSafe website directs individuals who need refurbishment or repair to "authorized service centers" in Elm City, Greensboro, Greenville, Charlotte, Hickory, Concord, Raleigh, and Burlington, North Carolina.

### III. STANDARD OF REVIEW

Rule 12(b)(2) provides for dismissal for "lack of personal jurisdiction." FED. R. CIV. P. 12(b)(2). When a district court considers a Rule 12(b)(2) motion based on the contents of the complaint and supporting affidavits without an evidentiary hearing, the party asserting jurisdiction bears the burden of establishing a prima facie case of jurisdiction. Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226 (4th Cir. 2019); Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014). The standard or review is by a preponderance of the evidence. Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). The court may consider affidavits submitted by both parties, but it must resolve factual disputes and draw all reasonable

inferences in favor of the party asserting jurisdiction. Universal Leather, 773 F.3d at 560; Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989) ("[T]he court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."). The court must then determine whether the facts proffered by the party asserting jurisdiction make out a case of personal jurisdiction over the party challenging jurisdiction. Sneha Media & Entm't, LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 196–97 (4th Cir. 2018).

## IV. DISCUSSION

The exercise of personal jurisdiction over a nonresident defendant is proper in North Carolina when (1) there is a basis for jurisdiction under North Carolina's long-arm statute, and (2) the exercise of personal jurisdiction complies with due process. Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 677 (M.D.N.C. 2011). Courts construe North Carolina's long-arm statute to be coextensive with due process, such that the two-part test collapses into the single inquiry of "whether the non-resident defendant has such 'minimum contacts' with the forum state that exercising jurisdiction over it does not offend 'traditional notions of fair play and substantial justice.'" Id. (quoting Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001)). In other words, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Personal jurisdiction may be exercised specifically or generally. Here, Plaintiffs do not contend that this Court can exercise general personal jurisdiction against Defendants. Indeed, Defendants' activities in North Carolina have not been continuous and systematic such that the

8

court may exercise general personal jurisdiction over them. That is, although Defendants conduct business in North Carolina, Defendants' contacts with North Carolina are insufficient to render Defendants "essentially at home" in North Carolina for purposes of general personal jurisdiction. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (citing Int'l Shoe Co. v. Wash., 326 U.S. 310, 317 (1945)).

Plaintiffs argue, however, that this Court may assert specific jurisdiction over Defendants because Plaintiffs' claims arose out of Defendants' purposeful contacts with North Carolina. According to Plaintiffs, the key jurisdictional facts are as follows:

- Plaintiffs were residents of North Carolina at the time of the accident.
- The car seat at issue was purchased by a North Carolina resident and shipped to the family in North Carolina.
- Plaintiffs used the car seat in North Carolina.
- The car fire occurred in North Carolina.
- Plaintiffs' children died in North Carolina, and Ms. Frost suffered permanent and disfiguring injuries in North Carolina.
- Defendants manufactured car seat buckles, including the defective buckle at issue in this lawsuit, knowing that they would be incorporated in car seats sold and used in North Carolina.
- Defendants ensured that their buckles met compliance standards so that they could be sold in North Carolina.
- Defendants have availed themselves of doing business in North Carolina, including with respect to buckles and other seat-restraining systems.
- Defendants sell safety restraints to customers in North Carolina.

9

- Defendants maintain business locations in North Carolina.
- And Defendants advertise repair and replacement services at eight locations in North Carolina.

To establish specific jurisdiction, the plaintiff must show "a sufficient nexus between [the] defendants' contact with the forum state and the nature of the claims asserted." WLD, LLC v. Watkins, 454 F. Supp. 2d 426, 432 (M.D.N.C. 2006). The Fourth Circuit has applied a three-part test for determining whether specific jurisdiction exists: (1) whether and to what extent the defendant "purposely availed" itself of the privileges of conducting activities in the forum state; (2) whether the plaintiff's claim <u>arises out of</u> those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (emphasis added). For specific jurisdiction to exist, <u>all three</u> of the above-cited factors must be satisfied. Brown v. Advanced Dig. Sols., LLC, No. 17-0034, 2017 WL 3838640, at *5 (W.D.N.C. Aug. 31, 2017). If the plaintiff meets the first two prongs, then the burden shifts to the defendant to show that exercising jurisdiction would be unreasonable. Grober v. Mako Prods., Inc., 686 F.3d 1335, 1346 (Fed. Cir. 2012).

Plaintiffs have alleged sufficient facts to meet the first prong of the three-prong test. Defendant AmSafe Commercial (now Shield) sells three-point seat belts as well "fire equipment apparatus makers" to customers in North Carolina. (Zabalgoitia Decl. Ex. A (Shield 30(b)(6) Dep. 67:1–25)). These customers include American LaFrance, who purchases seat belts for fire trucks in North Carolina. (Id. (Shield 30(b)(6) Dep. 71:10–25)). AmSafe Commercial (now Shield) ships directly from Indiana to North Carolina to these customers. (Id. (Shield 30(b)(6) Dep. 70:21–25)).

Transdigm has two subsidiaries in North Carolina, in Goldsboro and Lillington.

10

(Zabalgoitia Decl. Ex. C (TransDigm 30(b)(6) Dep. 25:19–21).) These locations are displayed on TransDigm's website where it maps its "global locations" on its website. Defendant AmSafe Inc. also tells North Carolina customers that they should only use "AmSafe and AmSafe approved repair stations." The AmSafe website directs individuals who need refurbishment or repair to "authorized service centers" in Elm City, Greensboro, Greenville, Charlotte, Hickory, Concord, Raleigh, and Burlington.

These contacts demonstrate a long-term and multitudinous relationship between, not just one of the Defendants and the forum state, but each one of the Defendants and the forum state. Defendants have purposefully availed themselves of doing business in North Carolina for at least 11 years and continue to do so.

The Court further finds that Defendants' contacts with North Carolina "form the basis of th[is] suit" for purposes of specific jurisdiction. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278–79 (4th Cir. 2009). In Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017 (2021), in a 8-0 decision, the Supreme Court affirmed the exercise of specific personal jurisdiction over a national manufacturer in product liability lawsuits brought by plaintiffs in their home states relating to accidents that happened in their home states. In Ford Motor Co., the Supreme Court considered whether a state court had jurisdiction over Ford Motor Company in a products-liability suit stemming from a car accident. The plaintiff filed suit in the state where the accident occurred. The victim was one of the state's residents. And Ford conducted business in the state—among other things, "advertising, selling, and servicing the model of vehicle the suit claims is defective." Id. at 1022. Ford objected to jurisdiction, however, arguing that the particular car involved in the car accident was neither first sold in the forum state nor designed nor manufactured there. Id. The Supreme Court rejected that argument, finding that when a

11

company serves a market for a product in a state and that product causes injury in the state to one of its residents, the state's courts may entertain the resulting suit. Id. at 1027.

Applying this case law, North Carolina courts have exercised personal jurisdiction over a defendant when an "alleged defect caused injury within North Carolina," despite the fact that the defendant was not "at home" in North Carolina. Cohen v. Norcold, Inc., No. 5:20-CV-170-BO, 2021 WL 4037831 (E.D.N.C. Sept. 3, 2021). In Cohen v. Norcold, for example, the district court found personal jurisdiction over an out-of-state defendant (Holiday Kamper) who sold and serviced a recreational vehicle in South Carolina that was subsequently purchased by plaintiffs in North Carolina. Id. at *3. Plaintiffs lived in the vehicle in Johnston County, North Carolina, when the recreational vehicle caught on fire and its contents were destroyed. Id. The court found personal jurisdiction over Holiday Kamper because Holiday Kamper operated six stores in North Carolina. Id. Despite that the recreational vehicle was serviced in South Carolina, "the alleged defect caused injury within North Carolina and the product serviced by defendant was used or consumed within North Carolina." Id. at *4. In other words, Holiday Kamper's presence in North Carolina was sufficient to convey jurisdiction even though it was not causally related to the recreational vehicle's fire. See also Cohen v. Cont'l Motors, Inc., 864 S.E.2d 816, 827 (N.C. Ct. App. 2021) (extensively analyzing Ford, reversing the trial court's dismissal of an aircraft-component-parts manufacturer, and holding that "this exact fact pattern (a resident-plaintiff sues a global [aviation] company, extensively serving the state market . . . . for an in-state accident) also effectively functions as an illustration—even a paradigm example—of how specific jurisdiction works") (quotation marks omitted)).

Here, Defendant AmSafe Commercial (now Shield) has provided safety restraints to customers in North Carolina for at least 11 years. (Zabalgoitia Decl. Ex. C (Shield 30(b)(6) Dep.

67:1–25) ("We provided seat belts to customers, commercial entities, within North Carolina for standard seat belts . . . .")). These customers are purchasing safety restraints for some of North Carolina's most important public safety vehicles—fire trucks. And they rely on AmSafe Commercial (now Shield) to provide safe products in North Carolina. In other words, AmSafe Commercial (now Shield) is holding itself out in North Carolina as a reliable manufacturer of the same type of product—safety restraints—at issue in this litigation. Simultaneously, Defendants sold similar safety restraints to car seat manufactures in other states knowing that those buckles would end up on car seats sold to a national audience, including customers in North Carolina. Just as in Cohen v. Cont'l Motors, Inc., here "the alleged defect caused injury within North Carolina and the product [manufactured and designed] by defendant was used or consumed within North Carolina." Cohen, 2021 WL 4037831, at *4.

Defendants cite Walden v. Fiore, 571 U.S. 277, 284 (2014), for the proposition that the claims "must arise out of contacts that the 'defendant himself' creates with the forum state." (Defs.' Br. at 16). But the Supreme Court itself distinguished Walden in Ford. Specifically, the Supreme Court emphasized that, in Walden, "only the plaintiffs had any contacts with the State of Nevada; the defendant-officer had never taken any act to "form[] a contact" of his own. Ford Motor Co., 141 S. Ct. at 1031. The officer had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." Id. The Supreme Court, therefore, emphasized that the Walden defendant had never "purposefully avail[ed himself] of the privilege of conducting activities" in the forum State. Id. at 1031–32. That's not the case here. Every Defendant named in this lawsuit has purposefully availed itself of the privilege of doing business in North Carolina. AmSafe Commercial (now Shield) has served long-term customers in the

state. AmSafe Inc. services customers in the state. And TransDigm operates multiple businesses in the state, advertising them on their website of "global locations."

Defendants' reliance on Bristol-Myers Squibb Co. v. Superior Court of California, 137 S. Ct. 1773 (2017), is also misplaced. Again, the Supreme Court distinguished Bristol-Myers in Ford, explaining that they "found jurisdiction improper in Bristol-Myers because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims." Ford, 141 S. Ct. at 1031. In Bristol-Myers Squibb Co. v. Superior Court, more than 600 plaintiffs, most of whom were not California residents, filed a civil action against Bristol-Myers Squibb Company ("BMS") in a California state court. The California Supreme Court held that the plaintiffs could exercise specific jurisdiction over the defendants.

In reversing the judgment of the California Supreme Court, the U.S. Supreme Court reiterated that "[i]n order for a state court to exercise specific jurisdiction over a nonresident defendant, 'the suit' must 'arise out of or relate to the defendant's contacts with the forum." Id. at 11 (citing Daimler, 134 S. Ct. at 746). In other words, there must be an "affiliation between the forum and the underlying controversy" because "[s]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Id. (quoting Goodyear, 564 U.S. at 919). When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State. Id. at *13. "Even regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales." Goodyear, 564 U.S. at 931, n.6.

In Bristol-Myers Squibb, most of the 600 plaintiffs were not residents of California; they were not prescribed drugs in California; they did not ingest the drugs in California; and they were not injured in California. Id. Here, the opposite is true. Just like the plaintiffs in Ford,

14

Plaintiffs are residents of North Carolina; they used Defendants' defective products in North Carolina; and they suffered injuries when Defendants' defective products failed in North Carolina. Thus, Bristol-Myers Squibb does not foreclose the exercise of personal jurisdiction over Defendants. Accordingly, Plaintiffs have met the second prong of the three-prong test for specific jurisdiction.

In assessing the third prong of constitutional reasonableness, the court "ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." Elec. Buffalo, LLC v. Kuhmute, Inc., No. 2:21cv2764, 2021 WL 5597860, at *6 (D.S.C. Nov. 30, 2021). Although it may be less burdensome for the litigation to occur in one of Defendants' states of residence, "litigating in North Carolina must be 'so gravely difficult and inconvenient that [the defendant] unfairly is at a severe disadvantage in comparison to his opponent.'" Lillie v. Guerra, No. 1:20cv905, 2021 WL 4129235, at *6 (M.D.N.C. Sep. 9, 2021) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985)). In assessing this question, courts consider factors including: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies. Each of these factors supports the exercise of personal jurisdiction here. Id. at *18.

First, the burden on the Defendants litigating in this forum are minimal. Moreover, courts have considered the fact that a defendant had already secured local counsel to defend it as evidence of minimal burden. See, e.g., Elec. Buffalo, LLC, 2021 WL 5597860, at *6 (emphasizing that personal jurisdiction was constitutionally reasonable where Defendant

15

"secured local counsel to defend it in this litigation"). Here, Defendants have obtained local counsel and are well represented in this litigation. There is no evidence that they are at a severe disadvantage in comparison to Plaintiffs.

Moreover, since Defendants all have different principal places of business, there is no forum that would be burden-free for all of the Defendants. AmSafe Commercial and AmSafe Inc. have their principal place of business in Arizona; TransDigm has its principal place of business in Ohio; and Shield has its principal place of business in Indiana. The forum state North Carolina therefore has a strong interest in adjudicating this dispute. See, e.g., Ford, 141 S. Ct. at 1030 (noting that states have a significant interest in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors, as well as enforcing their own safety regulations") (internal quotations omitted); see also Bundy v. CitySwitch II, LLC, No. 3:20-cv-00618-FDW-DSC, 2021 WL 4142677, at *6 (W.D.N.C. Sept. 10, 2021) ("North Carolina has a strong interest in adjudicating the issues: Plaintiffs are North Carolina residents, seek relief under the North Carolina unfair trade practices statute, and assert claims arising out of services provided in North Carolina.").

Here, North Carolina certainly has a strong interest in having the disputed litigated in this state, and Plaintiffs have a strong interest in obtaining relief here. Plaintiffs were North Carolina residents during the injury. Plaintiffs seek relief under North Carolina laws, including North Carolina Gen. Stat. §§ 99B-5 and 99-B6. Finally, Plaintiffs' claims arise out of a horrific incident that occurred in North Carolina, in which Plaintiffs suffered the loss of two children, also North Carolina residents. The car seat with the defective buckle was purchased by a North Carolina resident. In sum, North Carolina has a strong interest in providing its residents with a forum to redress injuries inflicted by out-of-state actors.

16

Case 1:21-cv-00156-MOC-WCM   Document 49   Filed 03/18/22   Page 16 of 17

Finally, there is a shared interest among the states in obtaining efficient resolution of disputes, and each of the involved states has an interest in furthering substantive social policies. North Carolina is the right place to litigate this dispute. Not only do all of Plaintiffs' contacts relate to North Carolina: Plaintiffs, along with their children, were and/or are North Carolina residents. The car seat with the defective buckle was purchased by a North Carolina resident. Ms. Frost used the car seat in North Carolina. The car fire occurred in North Carolina. And Plaintiffs' children died in North Carolina.

Moreover, each of the Defendants has ties to this state. AmSafe Commercial (now Shield) sells safety restraints to customers here, including ambulances and fire trucks. TransDigm owns two businesses that operate out of North Carolina locations. And AmSafe Inc. instructs residents to use its approved repair and refurbishment facilities, directing North Carolina residents to its North Carolina approved providers. Where Defendants themselves are principally located in Arizona, Ohio, and Indiana respectively, North Carolina appears to be the sole location with which each of them has significant enough contacts such that maintaining the suit will not offend traditional notions of fair play and substantial justice.

## V. CONCLUSION

For the reasons stated herein, the Court finds that it may assert personal jurisdiction over Defendants in North Carolina. **IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss for Lack of Jurisdiction, (Doc. No. 10), is **DENIED**.

Signed: March 18, 2022



Max O. Cogburn Jr
United States District Judge